**Steven L. PHILLIPS, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 12S00–9508–CR–1021.

Supreme Court of Indiana.

Nov. 21, 1996.

Michael A. Dvorak, Hahn, Walz, Knepp and Dvorak, South Bend, for Appellant.

Pamela Carter, Attorney General of Indiana and Carol A. Nemeth, Deputy Attorney General, Indianapolis, for Appellee.

SHEPARD, Chief Justice.

A jury found appellant Steven Phillips guilty of murder, Ind.Code Ann. § 35–42–1–1 (West Supp.1996). The trial court sentenced him to sixty years in prison. In this direct appeal, Phillips raises two issues:

1. Whether Phillips made a knowing and intelligent waiver of his state constitutional right to be heard by himself at trial; and

2. Whether the admission of statements made by a non testifying co-defendant was in violation of Phillips' Sixth Amendment right to confrontation as defined in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

We affirm.

## I. Facts

The evidence at trial, viewed in a manner favorable to the verdict, revealed that the events leading to this appeal commenced

during an evening that Phillips, Albert Pauley, Jr. and Juanita Bristow spent at the home of Robert Patchett in Frankfort, Indiana. Pauley and Phillips believed that Phillip "Ryan" Paul was a confidential police informant; therefore, they decided to hurt him. When Paul arrived late in the evening, Pauley immediately approached him and shoved him to the floor. Phillips struck Paul with a lead pipe filled with rocks, and Patchett punched him. Pauley stabbed Paul several times. The perpetrators stuffed the victim's body into a trash bag, drove to a nearby creek, and dumped the body. They then returned to Patchett's house and cleaned the victim's blood from the carpet.[1]

Pauley and Phillips were tried jointly after the court denied a motion for separate trials. The trial court granted Phillips' motion in limine, which sought to prohibit the State from introducing evidence of any defendant's statement as substantive evidence against any other defendant until the court had, outside the presence of jury, determined the admissibility of the statement. Even though the court entered such an order, the prosecution asked witness James Flaugher about statements Pauley made to him while he and Pauley were working together. The only people present during this conversation were Flaugher, Pauley and Frank Hale. Specifically, Flaugher testified that Pauley told him, "I killed somebody." (R. at 434.) He also testified that Pauley admitted stabbing the victim "in the back of the head or ... neck twice with [a] screwdriver" and then stabbing him in the ear. (R. at 435.) Pauley further told Flaugher that

> he was the one that ... jumped on [Paul] as soon as he had walked in the door and that had got him down and *they* had tied him up.... *[T]hey* all three had beat him.... [A]fter he was dead, *they* had put trash bags around him and taped him up, and ... *they* carried him from the house to the trunk of the car, and from there *they* ... took him to where *they* had dumped him off.... I had asked him why

*they* did it, and he had just said ... the guy that *they* had killed came over and told Bobby that he was a narc and that he was going to turn him in, and that was the reason for doing it.

(R. at 436–40 (Emphasis added).) Flaugher further testified that a few days after the conversation with Pauley, Flaugher had a conversation with Phillips in Pauley's presence. That testimony went as follows:

Q: Would you relate to the jury what the defendant, Steven Phillips, said to you about his involvement in this death?

A: Well, when I walked up there, I said, "Hi," and this and that, and [Pauley] had told [Phillips], "Yeah, I told [Flaugher]." And [Phillips said], "That's cool." He [said], "Yeah, we (indiscernible) somebody."

Q: Did you believe that to be referring to the same situation?

A: Yes.

Q. Did he describe his participation in the death?

A: Yes, that he had just beat on him.

(R. at 442–43.)

Subsequent testimony by Chastity McDaniel, Victoria Sanders, Robert Patchett, Frank Hale, Juanita Bristow and Bruce Spencer linked Phillips directly to the murder. (R. at 557–58, 561–64, 773, 775–76, 780). The State also presented other circumstantial evidence which supported Phillips' conviction.[2]

## II. State Constitutional Claim

Phillips' counsel, out of the presence of the jury, advised the judge that "Mr. Phillips does not intend to call witnesses or otherwise testify himself in his case-in-chief." (R. at 890.) The next day, in the presence of the jury, Phillips' attorney rested his case-in-chief. Appellant argues that he was denied the right to testify which the Indiana Constitution affords him.

The Indiana Constitution does provide that a defendant has a right to be heard by

---

1. The facts of this case may also be found in *Pauley v. State,* 668 N.E.2d 1212 (Ind.1996).

2. The autopsy report indicated that Paul was hit on the head with a pipe and stabbed in the back

of the neck. (R. at 421.) DNA analysis of blood samples from Patchett's home, the bridge guardrail, Phillips' car, and the victim further corroborated Patchett's testimony. (R. at 729–30.)

himself and counsel in all criminal prosecutions. Ind. Const. art. I, § 13.[3] In furtherance of this right, our ethical rules provide that "[i]n a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to . . . whether the client will testify." Rules of Professional Conduct 1.2(a) (1996).

■ Phillips asserts that the trial court judge has an affirmative duty "to inquire directly of the defendant whether he wants to testify." (Brief for Appellant at 32–33). The State, however, argues that the trial judge has no duty to insure that a *counseled* defendant has made a knowing and intelligent waiver of the right to testify. The State is correct.

Appellant relies in large measure on the decision in *Winkelman v. State*, 498 N.E.2d 99 (Ind.Ct.App.1986). In *Winkelman*, Mr. and Mrs. Winkelman proceeded pro se in their trial on charges of neglect of a dependent. The Winkelmans claimed that "they did not knowingly and intelligently waive their right to present evidence on their own behalf." *Id.* at 100. They contended that since they did not "knowingly and intelligently" waive their right to present evidence, they were denied a fair trial. The trial court had touched on this opportunity with the defendants in what the Court of Appeals called "a disjointed and interruptive colloquy." *Id.* at 101. The record consisted of "interruptions, broken sentences, and unintelligible responses with the trial judge and [the defendants] both talking at the same time, neither listening to the other." *Id.* The Court of Appeals held that "[i]t was the duty of the trial judge to clearly explain to the Winkelmans that they could offer testimony, including their own, at the end of the state's case. It was also his duty to clearly make a record of the explanation." *Id.* Concluding that the trial court had done neither, the Court of Appeals reversed and remanded for a new trial.

■ The Court of Appeals decision in *Winkelman* was a sound approach for a case involving pro se defendants. In contrast, the rule for counseled defendants, however, is described in *Correll v. State*, 639 N.E.2d 677 (Ind.Ct.App.1994). The Court of Appeals held that a trial court judge has no affirmative duty to insure that a defendant *represented by counsel* knowingly and intelligently waived his right to testify at trial. *Id.* at 681–82. A trial court is entitled to presume that a lawyer and his client have discussed the possibility of testifying.

■ The *Correll* court said that "the mere assertion after being convicted that 'my lawyer wouldn't let me testify' is 'insufficient to require a hearing or other action on [a defendant's] claim that his right to testify in his own defense was denied him.'" *Id.* at 681 (quoting *Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir.1991)). We agree with The Court of Appeals and the Seventh Circuit that "'some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify.'" *Id.* Phillips does not contend (much less prove) that he made his decision not to testify absent meaningful consultation with his counsel, or that his counsel impermissibly forbade him from testifying. That being so, there was no error.

### III. The Bruton Claim

■ A good many people testified at trial concerning Phillips' participation in the murder. Robert Patchett testified that he, Phillips and Pauley joined in beating up Paul. Specifically, Patchett testified that Phillips beat Paul numerous times with a pipe filled with rocks. Patchett further testified that after Pauley stabbed Paul, the three men put Paul's body in a trash bag, placed it in the trunk of Phillips' car, and dumped the body off of a bridge. Juanita Bristow, who was in the bedroom at the time of the murder, testified that she heard Phillips, Pauley and Patchett beating Paul in the living room for approximately two hours. Bristow testified

---

**3.** The right to be heard had a solid foundation among those who wrote our Constitution. Indeed, as part of the constitutional convention's lengthy debate over abolition of grand juries, delegate Phineas M. Kent argued for a provision affording persons the right to be heard in public before a trial on charges could occur. 2 Debates of the Convention 1375 (1850).

that she saw the three men take Paul's body, which was wrapped in trash bags and taped closed, out of the house. Bruce Spencer, Victoria Sanders, Frank Hale and Chastity McDaniel all testified that Phillips confessed his involvement in the murder to them. Among all this, Flaugher testified about Pauley's statement, "I killed somebody." Flaugher also related Pauley's version of the events by using plural pronouns ("[A]fter he was dead, they put trash bags around him.... ").

Phillips claims that these statements attributed to codefendant Pauley tended to incriminate him. Phillips contends that although Pauley's confession did not mention him by name, it was in violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because it involved facially incriminating declarations. In *Bruton*, the U.S. Supreme Court held that the introduction of extrajudicial statements of a co-defendant at a joint trial denied the defendant an opportunity to cross-examine the co-defendant as to his statement, thereby depriving the defendant of his right to confront a witness against him.

It is entirely possible that the jury understood the use of "they" in Flaugher's testimony about Pauley's statements to reference Pauley, Phillips and Patchett. They could only make this link, however, because of the overwhelming cumulative evidence from other witnesses.[4] The testimony of Flaugher, McDaniel, Sanders, Patchett, Hale, Bristow and Spencer, and the joint trial of Pauley and Phillips, make it extremely easy to infer that "they" included Phillips.

On the other hand, Phillips' trial counsel did not object during Flaugher's testimony, possibly because these references to multiple actors were so inconsequential in light of Phillips' own individual confessions. Accord-

ingly, appellant has not preserved any issue for appeal.

We affirm the judgment of the trial court.

DICKSON, SULLIVAN, SELBY and BOEHM, JJ., concur.

---

**4.** We have held that even such indirect references implicate a defendant's *Bruton* rights. *Taggart v. State*, 595 N.E.2d 256, 258 (Ind.1992) (citing *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). *See also Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)) (holding that in the absence of a limiting jury instruction the Confrontation Clause bars the admission of a non-testifying co-defendant's confession, where the co-defendant used the pronouns "we" and "he" in describing the activities of himself and other persons, if other evidence introduced at trial nevertheless links the defendant to the co-defendant's confession).